*********** *Page 2 
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Donovan with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. On January 24, 2003, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act and Plaintiff was an employee of Defendant-employer. The parties were all correctly named and designated and the Industrial Commission has jurisdiction of the parties and the subject matter of this claim.
2. On January 24, 2003, Plaintiff sustained a compensable injury by accident to her left shoulder, arising out of and in the course of her employment.
3. Defendant accepted Plaintiff's claim as compensable.
4. Plaintiff's average weekly wage is $461.67, resulting in a weekly compensation rate of $307.80.
5. Psychological treatment for the treatment of depression, anxiety and anger, secondary to chronic pain was authorized by Defendant through a letter to Executive Secretary Weaver on February 15, 2005. On May 23, 2006, the Commission approved a Consent Order entered into by the parties stating Defendants agreed to pay for the treatment of depression, anxiety and anger, secondary to chronic pain.
6. The issues for determination are:
 a. Whether Plaintiff is entitled to attendant care?
 b. If so, who should provide attendant care and at what compensation?
 c. What amount, if any, is due for past attendant care provided by family members? *Page 3 
 d. Whether Plaintiff is entitled to continued treatment for depression, anxiety or anger, secondary to chronic pain?
 *********** EXHIBITS
1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: I.C. Forms and motions
 b. Stipulated Exhibit #2: Records of Carolina Case Management Rehabilitation Services (submitted post-hearing).
2. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
 a. Plaintiff's Exhibit #1: Medical records (in three parts)
 b. Plaintiff's Exhibit #2: Rehabilitation reports
 c. Defendants' Exhibit #1: IME Report of Dr. Hinnant with attached medical records from various providers
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On January 24, 2003, Plaintiff was working as a Correction Officer when she slipped on a patch of ice and fell onto her head, neck, shoulders and back. Emergency room doctors and the West Anson Medical clinic diagnosed a mild concussion, back, neck and arm pain. Defendant accepted liability Plaintiff's injuries on a Form 60 filed on April 14, 2004. *Page 4 
2. Plaintiff underwent shoulder surgery on May 29, 2003. Dr. Seth Jaffe performed a left shoulder arthroscopic removal of adhesions in the subacromial space and removal of an enlarged bursa. Plaintiff continued to have difficulties and was referred to Dr. Patrick Connor in July 2003. Dr. Connor diagnosed Plaintiff with left shoulder recurrent/persistent adhesive capsulitis, but opined that it was too soon for a repeat surgery. Plaintiff continued in physical therapy until September 24, 2003, and returned to work on August 31, 2003.
3. Defendant authorized Plaintiff's treatment for depression with Piedmont Behavioral Health Care and Dr. Yuejin-Chen. Dr. Yuejin-Chen's initial evaluation of Plaintiff was performed in December, 2003. Dr. Yuejin-Chen noted crying spells, irritability, feelings of hopelessness, but no evidence of psychosis. He diagnosed adjustment disorder with mixed anxiety and depressed mood and recommended Zoloft and Ambien. When Plaintiff's crying spells continued and she complained of feelings of restlessness, her medications were switched to Remeron. Plaintiff reported that she felt no different and noted that she was hearing a "crink sound" sometimes.
4. As a result of statements made by Plaintiff during one of her sessions, Dr. Yuejin-Chen sent Plaintiff for an evaluation for involuntary commitment at Union Regional Hospital on April 21, 2004. Plaintiff was re-evaluated at Stanly Memorial Hospital on April 22, 2004, and found not to be a danger to herself or others.
5. On April 28, 2008, Plaintiff presented to psychologist, Dr. Sally Duffy. Dr. Duffy diagnosed Plaintiff with chronic pain, depression, anxiety and anger, secondary to the chronic pain and attendant issues, including loss of employment, treatment upon her return to work and financial stressors. Dr. Duffy strongly recommended a referral to psychiatrist Felix Muniz to *Page 5 
address her psychotropic medication needs, and confirmed that Plaintiff did not require commitment.
6. Plaintiff presented to Dr. Muniz for pain management on May 24, 2004. Dr. Muniz diagnosed Plaintiff with chronic left shoulder pain, possible adhesive capsulitis or impingement syndrome and depression secondary to chronic pain. Dr. Muniz opined that chronic pain "comes hand to hand with some kind of anxiety or depression associated because of all the decrease in function and quality of life associated with a chronic pain." Accordingly, he recommended that Plaintiff continue to treat with Dr. Duffy to help her to cope with the chronic pain.
7. Plaintiff underwent a second shoulder surgery on September 16, 2004, performed by Dr. Patrick Connor. He noted that even while under anesthesia, Plaintiff had very limited ROM of the shoulder. Dr. Connor debrided the rotator cuff and did a global circumferential capsular release. Defendant agreed that Plaintiff was totally disabled as a result of the shoulder surgery and benefits were re-instated.
8. On October 8, 2004, Nurse Judy Robinson filed a report containing the following statement: "It is and has been, this CM's opinion that the client's mental health issues are related to the work injury. . . . I have had the opportunity to view the entire continuum of care and progression of symptoms. It is my opinion that this client's mental health status arose from the sequelae of her work injury. I respectfully request that the decision to deny MH benefits be reconsidered." Shortly thereafter, Nurse Robinson was removed from Plaintiff's case. 9. Plaintiff filed a Form 33 Request for Hearing on the issue of Defendants' refusal to authorize medical treatment and improper removal of a rehabilitation nurse. *Page 6 
Defendant filed a Form 33R on January 26, 2005, denying that depression and psychiatric conditions were related to the left shoulder injury. 10. On February 15, 2005, Defendant reversed their denial of mental health treatment and agreed to pay for Dr. Duffy's past and ongoing treatment of depression, anxiety and anger; however, Defendant still did not approve psychiatric care.
11. Plaintiff continued to receive treatment for chronic pain from Dr. Muniz. Dr. Duffy noted throughout March 2005, that Plaintiff's depression and anxiety condition had worsened and recommended that she be provided with immediate treatment with a psychiatrist.
12. Dr. Duffy secured a Minnesota Multiphasic Personality Inventory (hereinafter "MMPI") administered at the request of the N.C. Department of Corrections on August 3, 2000 as a requirement of hiring the Plaintiff. The results were compared to an MMPI administered by Dr. Duffy on July 12, 2004. Plaintiff's pre-injury MMI was interpreted as normal. The July 2004 MMIP was interpreted as showing Plaintiff was extremely distressed and dysphoric, with no sense of self-esteem. The test result also suggests that Plaintiff has a poor prognosis for a complete recovery.
13. Dr. Duffy secured an appointment for Plaintiff with Dr. Patricia Boyer, a psychiatrist, on May 12, 2005 and June 10, 2005. Dr. Boyer noted that Plaintiff had paranoia, auditory hallucinations, and past homicidal and suicidal ideation. She diagnosed Plaintiff with Major Depression with psychosis. She stated that Plaintiff was severely depressed and on the verge of non-communicativeness.
14. Dr. Boyer retired and Plaintiff's care was transferred to Dr. Alan Lombardi, at University Psychiatric Associates. On October 11, 2005, Plaintiff presented to Dr. Lombardi who noted that Plaintiff was hearing cricket like sounds or traffic noises in her head, felt that she *Page 7 
could not be still and experienced memory difficulties. Dr. Lombardi diagnosed Plaintiff with marked memory problems and cognitive dysfunctioning due to her depression from her chronic pain or the medications used to relieve the chronic pain. Dr. Duffy continued to recommend behavioral therapy for Plaintiff's depression, including getting out of bed and out of the house every day, making a list of things to do, and making certain that she is involved in family and social activities.
15. In 2005, Plaintiff's family observed specific events and behaviors that caused them to become concerned for her safety and her emotional health. Plaintiff started staying in bed all day; she stopped doing her hair or getting dressed; she stopped going to church; she was less aware of things around her, repeated her questions and had problems understanding or remembering things. Plaintiff suffered from emotional mood swings, going from crying to anger to laughter, often inappropriate to the situation. She would often sit in a chair and not speak or respond to questions and became increasingly paranoid. She often talked about going to a dark place or the dark side. On one occasion she went out by herself and became lost and confused at the local Wal-Mart store. On another occasion, Plaintiff's husband woke one night at 2:00 a.m. to find Plaintiff in the kitchen, with the oven on and a bed sheet in the frying pan. She often asked if other people heard the sounds of crickets, but no one else heard such a sound. She talked about hearing voices that no one else heard.
16. The above occurrences are corroborated by the notes of Dr. Lombardi, who continued to treat Plaintiff into 2006. As of approximately March 27, 2006 and confirmed by Dr. Lombardi's testimony of February 26, 2009, Plaintiff requires eight hours of supervision a day as her cognitive impairment puts her at risk of harm. *Page 8 
17. Plaintiff's husband, Neal Franklin; daughter, Jessica Broadaway; son Christopher Broadaway; and sister, Sharon Broadaway, began taking shifts to stay at the house and care for and watch Plaintiff. Plaintiff's daughter changed jobs from CMC in Charlotte to CMC Union, to be closer to home. Additionally, Mary Marsh and other women from Plaintiff's church would come to sit with Plaintiff, help get her dressed, take her walking and generally keep her active.
18. After the family began keeping someone with Plaintiff, her symptoms improved. She did not experience a complete recovery, but she had increasing periods of lessened symptoms. Dr. Duffy and Dr. Lombardi noted the improvement in Plaintiff's condition.
19. In September 2006, Defendant offered to provide supervisory care from a healthcare agency for Plaintiff; however, Dr. Duffy opined that putting a stranger into Plaintiff's situation "will be extremely detrimental to her emotionally and will result in a return to her status of some months ago in which she was basically non-functional, psychotic and overtly suicidal."
20. On July 19, 2007, Plaintiff underwent an Independent Medical Evaluation performed by clinical psychologist, Dr. Donald W. Hinnant. Dr. Hinnant interviewed Plaintiff, reviewed her records of treatment by Drs. Duffy and Lombardi and attempted to obtain from Plaintiff answers to questionnaires and tests that he provided. Plaintiff refused to cooperate in answering most of the written questions presented by Dr. Hinnant. As a result of his IME, Dr. Hinnant opined that there appeared to be an inconsistency in Plaintiff's mental state from week to week. Additionally, there is inconsistency in whether or not there was a structured encouragement towards independence, as opposed to dependence in being taken care of or having a babysitter in the house.
21. Dr. Hinnant further opined that Plaintiff does not need day care or attendant daily supervision by anyone. Plaintiff does better when she is out of the home, involved in activities *Page 9 
and therapeutic types of things. Further, Dr. Hinnant opined that based on his review of Plaintiff's medical records that Plaintiff uses suicidal ideation as a manipulative way of controlling what is happening with treatment and activities and her entire situation.
22. Greater weight is given to the expert medical opinions of Drs. Duffy and Lombardi over that of Dr. Hinnant, based upon their extended courses of treatment over the one-time, record review-oriented examination of Dr. Hinnant.
23. Dr. Lombardi recommended eight hours of supervisory care on or about March 27, 2006 and confirmed the recommendation in deposition testimony on February 26, 2009. Dr. Duffy's testimony on February 26, 2009 supports Dr. Lombardi's opinions. Dr. Lombardi and Dr. Duffy's testimony compels a finding that attendant care would prevent Plaintiff from further harm and avoid hospitalization or needing to move her to a more restrictive environment.
24. The greater weight of expert medical opinion shows that it would be detrimental to Plaintiff to have a stranger provide such care. Dr. Lombardi's testimony of February 26, 2009, supported by Dr. Duffy's testimony, is particularly probative that using people unknown to the Plaintiff would likely lend to Plaintiff suspiciousness and paranoia. Plaintiff does not require special education or medical licensing, but is care that can be suitably provided by various family members and that family members have been providing such care since November 2005.
25. Plaintiff has requested payment for family members providing care in the amount of $9.00 per hour. Based upon the information in the record provided by Rehabilitation Nurse Stasia Hann, this is a reasonable amount based upon the rates for such services in the area in which Plaintiff resides.
26. Plaintiff remains temporarily totally disabled from employment. *Page 10 
27. Plaintiff's average weekly wage is $461.67, resulting in a weekly compensation rate of $307.80.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of the employment on January 24, 2003. N.C. Gen. Stat. § 97-2(6).
2. As a result of the compensable injury, Plaintiff is entitled to temporary total disability compensation at the rate of $307.80 per week from the date of injury and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Pursuant to the Consent Order approved by the Commission on May 23, 2006, Plaintiff is entitled to have Defendants provide for continuing treatment for psychological symptoms causally related to the compensable injury. N.C. Gen. Stat. § 97-25.
4. Dr. Lombardi provided a written statement regarding Plaintiff's need for supervisory care for eight hours per day, seven days per week, on March 27, 2006. The greater weight of the evidence establishes $9.00 per hour as reasonable amount to pay for such services. Therefore, beginning on that date, Defendants are responsible to pay $504.00 per week to the family members providing attendant care services. The sums paid should be divided among the family members according to the amount of care each has provided to the Plaintiff. Hatchett v. HitchcockCorporation, 240 N.C. 591, 83 S.E.2d 539 (1954).
5. Plaintiff is entitled to have Defendant provide and pay for medical and rehabilitation treatment and expenses incurred or to be incurred as a result of the compensable *Page 11 
injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1, including continuing treatment provided by Dr. Duffy and her referrals. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendant shall continue to pay temporary total disability compensation to Plaintiff at the rate of $307.80 per week until further Order of the Commission.
2. A reasonable attorney's fee of 25% of the compensation awarded to Plaintiff in Paragraph 1 above is hereby approved. Defendant shall pay every fourth payment directly to Plaintiff's counsel.
3. Defendant shall pay medical expenses incurred or to be incurred when medical bills have been submitted according to established Industrial Commission procedures.
4. Defendant shall pay for Plaintiff's family members to provide attendant care eight hours a day, seven days a week.
5. Defendant shall assign a nurse case manager to monitor attendant care services being provided by Plaintiff's family and friends. The nurse case manager shall provide periodic reports from family members describing the care they are providing and make recommendations as to Plaintiff's attendant care.
6. Beginning as of March 27, 2006, Defendant shall pay to Plaintiff's family members who provide attendant care to Plaintiff an amount of $504.00 per week to Plaintiff's *Page 12 
attorney, said sum to be held in trust until an agreement is reached among the family members providing attendant care as to the distribution of the accrued payments for attendant care. Payment of past due amounts shall be paid in a lump sum. Once an agreement is completed, Plaintiff's attorney shall distribute the trust funds to the appropriate persons. Thereafter, payments shall be made once per week, or once per month, pursuant to agreement of the parties. Should the parties be unable to agree, they may present a Motion for ruling on this issue.
7. As to ongoing attendant care from the filing date of this Opinion and Award, the nurse case manager shall obtain a schedule of the persons who are providing attendant care and shall submit the schedule to Defendants for timely payment to those persons.
8. Defendants shall pay the costs.
This the ___ day of June 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1